## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| KIM E. KNIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:15-cv-00820 |
| | ) | |
| ANDREW BOBANIC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **OPINION**

**Mark R. Hornak, Chief United States District Judge**

Late on the night of June 28, 2013, Shawn Knight was shot dead in the doorway of his home by Pennsylvania State Police Troopers Andrew Bobanic and Adam Janosko. Trooper Bobanic had responded to a report of a domestic dispute at Shawn Knight's home, and upon arrival had been told by the purported victim and her mother (Shawn Knight's wife) that matters had resolved. He then entered Shawn Knight's living room without a warrant or consent, nor in pursuit of a fugitive or in response to a cry for help. Trooper Bobanic did not identify himself as a police officer and his entry awoke Shawn Knight, who was asleep on his living room couch. Trooper Bobanic fled the Knight residence shortly after he entered it, shouting that he saw a gun. Two of Shawn Knight's revolvers were on a table next to Shawn Knight as he slept. As Trooper Bobanic fled the premises, Shawn Knight grabbed both of these legally possessed handguns and "flew" to his front door to investigate. As Shawn Knight opened the screen door to his front porch, Troopers Bobanic and Janosko fired their service weapons without warning and shot him dead.

The Plaintiff, Kim Knight, is Shawn Knight's widow and filed this suit on her own behalf and as the personal representative of Shawn Knight's estate. The only remaining count in the Complaint (ECF No. 1) is a claim pursuant to 42 U.S.C. § 1983 alleging the deprivation of Shawn Knight's rights under the Fourth Amendment to the United States Constitution.[1] Now before the Court is Defendants' Motion for Summary Judgment (ECF No. 67). Defendants seek the entry of summary judgment in their favor on the remaining claim against them on the grounds that the Troopers' actions were "objectively reasonable" as a matter of law, or alternatively, that the remaining claim is barred by qualified immunity. The matter has been fully briefed, orally argued, and is ripe for disposition.

The Court has (as it must) viewed all contested facts in this case in the light most favorable to the Plaintiff, the non-moving party. Ordinarily, the facts present in this record would dictate that a jury at trial determine the facts necessary to assess whether the Troopers' actions were objectively reasonable. *See Scott v. Harris*, 550 U.S. 372, 386 (2007). But because there was no binding legal authority, nor a robust consensus of persuasive legal authority, as of June 28, 2013, that clearly established that every reasonable police officer, faced with the precise or very closely analogous factual circumstances present in this case (viewed in the light most favorable to Plaintiff), would have known that the Troopers' conduct would have violated Shawn Knight's Fourth Amendment rights, the Court is compelled to conclude that Troopers Bobanic and Janosko are entitled to qualified immunity and are thus entitled to summary judgment in their favor.[2]

---

[1] Plaintiff withdrew Counts II, III, IV, V, VI, and VII of her Complaint in her Brief in Opposition to Defendants' Motion for Summary Judgment. (ECF No. 77). Plaintiff confirmed on the record in open Court during Oral Argument on the Motion for Summary Judgment, held on February 14, 2019, that Count I is the only active count remaining in this case. (ECF No. 95).

[2] The allocation of responsibility for determining whether the Troopers' actions were "objectively reasonable" is murky. In *Scott*, the Supreme Court acknowledged that the Fourth Amendment's "reasonableness" test is a

## I.  FACTUAL BACKGROUND

The record evidence in this case primarily consists of deposition testimony from the witnesses to the incident. In certain respects, the accounts of Kim Knight, the Plaintiff in this action and widow of Shawn Knight, and her daughter Amanda differ substantially from the accounts of Troopers Bobanic and Janosko, but the following facts are undisputed.

Kim Knight lived near Uniontown, Pennsylvania, with her husband, Shawn Knight, their four children, and their daughter Amanda Knight's fiancé and child. (Pl.'s Counterstatement of Material Facts ("Pl.'s CSF") ¶¶ 53, 55, ECF No. 80). On the evening of June 28, 2013, Amanda Knight was doing laundry in the home when the power went out. (Defs.' Concise Statement of Material Facts ("Defs.' CSF") ¶ 1, ECF No. 68). Her father, Shawn Knight, was in the kitchen cooking at the time. (*Id.* ¶ 2). Amanda and Shawn Knight began arguing, which escalated to the

"factbound morass," 550 U.S. at 383, but nonetheless concluded in the context of a summary judgment analysis there that, as a matter of law, no reasonable jury could find against the officers involved in that case given the undisputed facts in the case, *id.* at 386. Once all factual disputes are resolved and all inferences are drawn in the non-movant's favor, the reasonableness of an officer's actions is "a pure question of law." *Id.* at 381 n.1; *see also Johnson v. City of Phila.*, 837 F.3d 343, 349 (3d Cir. 2016) (citing *Scott* in an excessive force case for the proposition that the "objective reasonableness" of a use of force "is a pure question of law" when the material facts are undisputed and proper inferences are drawn). In this Court's assessment, as with any other issue in the summary judgment context, a Court may conclude as a matter of law that an officer's actions were or were not "objectively reasonable" when the material facts are undisputed. *Accord Untalan v. City of Lorain*, 430 F.3d 312, 315 (6th Cir. 2005) (affirming district court's grant of summary judgment in favor of the officer defendant because "no reasonable juror could disagree that [decedent] posed a serious and immediate threat to the safety of others"). There are plenty of factual disputes in this case as to the "objective reasonableness" of the Troopers' actions, but not as to the more limited core facts central to the qualified immunity analysis. Nearly all Circuits are now in agreement that the determination of whether a right is clearly established is "a legal issue for the judge to decide" when the material facts are undisputed. *See Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017) (collecting cases from the First, Second, Third, Fourth, Sixth, Seventh, Eighth, Eleventh, and D.C. Circuits). Here, there are no material facts in dispute that bear on whether the right at issue in this case was clearly established as of June 28, 2013, and thus the Court can determine as a matter of law whether qualified immunity applies at this juncture. There is some overlap as to the factual disputes bearing on the objective reasonableness of the officers' actions and whether the right at issue was clearly established, but the relevant legal tests and the import of such disputes is different as between the two determinations. For example, there are factual disputes in this case that, when resolved in favor of the Plaintiff, could lead a reasonable jury to conclude that the Troopers' actions were objectively unreasonable, but nonetheless lack an adequate analog in the body of relevant caselaw such that the right at issue here was not clearly established. This is all to say that there is nothing inherently inconsistent about the Court concluding that there are meaningful factual disputes as to whether the Troopers violated Shawn Knight's constitutional rights, which would normally dictate that this case proceed to trial, while at the same time concluding that some of the same facts are undisputed such that they conclusively demonstrate that the Troopers are entitled to qualified immunity as a matter of law. *Cf., e.g., Simmons v. Bradshaw*, 879 F.3d 1157, 1166 (11th Cir. 2018).

point that Amanda's brother, Matt, had to physically separate the two. (*Id.* ¶ 3). At some point with Matt Knight physically between the two, Shawn Knight struck Amanda Knight in the face with his hand. (Deposition of Amanda Knight ("Amanda Knight Dep.") at 25:10–15, ECF No. 69-1). Amanda and her father had gotten into arguments in the past and Amanda Knight had threatened to call 9-1-1 on previous occasions. (*Id.* at 32:21–25; Defs.' CSF ¶ 5). After she was struck by her father, Amanda called 9-1-1. (*Id.*). The 9-1-1 dispatcher advised Amanda that police would be on the way. (Amanda Knight Dep. at 35:1–3).[3] Amanda Knight stated that she told the dispatcher that there were weapons in the home. (Pl.'s CSF ¶ 57).

Kim Knight was away from the home during the argument and 9-1-1 call. (Pl.'s CSF ¶ 63). When she returned, she met Amanda Knight in the kitchen of the home and learned that Amanda and Shawn had gotten into a fight. (Deposition of Kim Knight ("Kim Knight Dep.") at 54:23–55:10, 57:19–23, ECF No. 69-2). Kim Knight testified at her deposition that Shawn Knight was asleep on the couch in the living room when she returned home. (*Id.* at 57:17–18). Amanda Knight had packed an overnight bag and planned on staying at a hotel with her fiancé and child for the night. (Amanda Knight Dep. at 35:1–14). Amanda Knight testified at her deposition that she took her bags and waited on the front porch for the police to arrive. (*Id.* at 38:9–13).

Trooper Adam Janosko arrived on the scene first, followed shortly thereafter by Trooper Andrew Bobanic in a separate patrol vehicle. (Pl.'s CSF ¶ 68). At all times relevant to this case, Troopers Janosko and Bobanic were uniformed law enforcement officers employed by the Pennsylvania State Police. (Compl. ¶¶ 7–8). Neither Trooper activated his lights or siren as he arrived on the scene. (Pl.'s CSF ¶ 69). Kim Knight testified that both she and Amanda Knight were on the front porch of the home when the Troopers arrived, and the screen door behind them

---

[3] The Pennsylvania State Police provide police protection to the unit of local government where the Knights lived.

into the home's living room was closed. (Kim Knight Dep. at 80:3–81:9). As the Troopers arrived, Kim and Amanda approached them and conveyed that the argument had deescalated and everything was "fine" inside. (*Id.*). According to Kim Knight, Trooper Bobanic appeared "very agitated for some reason" as they conversed. (*Id.* at 81:24–25). According to Trooper Bobanic, Kim and Amanda Knight appeared "excited, scared and stressed." (Deposition of Andrew Bobanic ("Bobanic Dep.") at 15:22–24, ECF No. 69-4). Kim Knight also testified that she told the officers that they "don't need to come in" and that Shawn Knight was sleeping. (Kim Knight Dep. at 82:3–6). Amanda Knight was uninjured and testified at her deposition that she told the Troopers that she was planning on staying at a hotel for the night. (Pl.'s CSF ¶ 71). Nonetheless, Trooper Bobanic attempted to enter the home. (Kim Knight Dep. at 82:3–9). He testified at his deposition that, notwithstanding what Kim and Amanda Knight told him, he believed that the situation had not yet deescalated and there may have been a victim or actor inside. (Bobanic Dep. at 41–42). Kim Knight claimed that she attempted to pull the door shut to prevent Trooper Bobanic's entry, but Trooper Bobanic "shoved right through" her and into the home. (Kim Knight Dep. at 82:3–9).[4] There is no evidence in the record that anyone living in the Knight household consented to Trooper Bobanic or Trooper Janosko entering the home. The only record evidence as to why Trooper Bobanic subjectively believed there was a victim or actor inside were his self-reported and generalized past experiences of responding to domestic disturbances, *e.g.*, where the other party to the dispute was likely still "inside" since he was not "outside."

---

[4] Trooper Janosko's testimony is different. He says that Amanda and Kim Knight were not on the porch, but were instead standing in the alcove inside the front door, apparently necessitating Trooper Bobanic's tight squeeze past them as he entered the house. (Janosko Dep. at 60:14–61:7). He described Kim Knight as "frozen" and Amanda Knight as "agitated." (*Id.* at 7:21–22, 47:3–4) He said Amanda may have said "he's in the living room." (*Id.* at 48:18–21). Trooper Bobanic testified that when he arrived, Trooper Janosko was talking with two females at the front door. He stated that he viewed the scene as an "active domestic" that had not deescalated, and that he entered the residence to try and "stabilize" the situation. (Bobanic Dep. at 11, 22, 23, 42). As noted above, the Court for these purposes must accept the version favorable to the Plaintiff.

(Bobanic Dep. at 42:5–25). The record does not reveal who that "other potential victim" might have been.[5]

Shawn Knight was lying on the living room couch when Amanda Knight called 9-1-1, (Pl.'s CSF ¶ 59), and Kim Knight claims that he was asleep there when she returned home, (*id.* ¶ 64), and at the time that Trooper Bobanic entered the home, (Kim Knight Dep. at 82:10–12). Shawn Knight owned two revolvers, and these guns were on top of a coffee table next to the couch he was lying on when Trooper Bobanic entered the home. (Pl.'s CSF ¶ 60; Defs.' CSF ¶ 10). According to Kim Knight, Shawn Knight always kept the guns near him while he slept. (Pl.'s CSF ¶ 60). There is no evidence in the record that Shawn Knight illegally owned his handguns or was otherwise prohibited from possessing them.[6]

Shawn Knight was stirred from his sleep when Trooper Bobanic entered the home, and Kim Knight testified that she observed Shawn Knight turn towards her and the front door. (Pl.'s

---

[5] "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980). The Supreme Court has long-recognized a short list of such exigent circumstances, such as to render emergency assistance or protect an occupant from imminent injury, *Brigham City v. Stuart*, 547 U.S. 398, 403–04 (2006), to engage in the hot pursuit of a fleeing subject, *Warden v. Hayden*, 387 U.S. 294, 299 (1967), to conduct a protective sweep of the premises to protect the safety of officers and others either incident to an arrest already made, or when there is an articulable suspicion that the area searched harbors a person who poses a danger to those present on the scene of an arrest, *Maryland v. Buie*, 494 U.S. 325, 334–35 (1990); *United States v. White*, 748 F.3d 507, 511 (3d Cir. 2014), and to prevent the destruction of evidence, *Kentucky v. King*, 563 U.S. 452, 460 (2011). Though this list is not exhaustive, none of these circumstances facially appear to have presented themselves in this case, nor were any of them advanced on the record as the basis of Trooper Bobanic entering the Knight home. And, there is no record evidence that the victim and her mother could not have been moved from the porch for questioning.

Further, even if there was a lawful basis for Trooper Bobanic to enter Shawn Knight's home, as a general matter he was obligated to knock on the door and announce his identity and purpose before entering. *See Richards v. Wisconsin*, 520 U.S. 385, 387–88 (1997). To avoid this requirement, Trooper Bobanic would have had to have had "a reasonable suspicion that knocking and announcing [his] presence, under the particular circumstances" presented here would have been dangerous, futile, led to the destruction of evidence, or otherwise inhibited "the effective investigation" of a crime. *Id.* at 394. No such specific reasons for Trooper Bobanic's failure to "knock and announce" have been advanced in this case.

[6] Counsel for the Defendants represented to the Court during Oral Argument on February 14, 2019, that there is no evidence in the record that Shawn Knight was prohibited in any way from possessing his firearms, nor was counsel aware of any such prohibition. The Court will thus assume for the purposes of this Motion that Shawn Knight legally possessed his guns.

-6-

CSF ¶¶ 76–77). Trooper Bobanic—without announcing his presence—took a "step or two inside the residence" before yelling "guns" and shoving past Kim Knight and Trooper Janosko (who remained on the front porch, but in close proximity to Trooper Bobanic) and running back out of the residence. (*Id.* ¶ 78, 80; Deposition of Adam Janosko ("Janosko Dep.") at 60:14–61:21, ECF No. 69-3). Trooper Bobanic testified during his deposition that he heard Shawn Knight tell him "in a loud voice" to "get out of my house" as Trooper Bobanic entered the residence. (Bobanic Dep. at 52:2–14).[7] Trooper Bobanic was in the residence for only a few seconds before retreating from the house, running past Trooper Janosko (who remained on the front porch), and jumping off of the porch. (Pl.'s CSF ¶ 81). Trooper Bobanic's flight prompted Trooper Janosko to also retreat from the porch. (*Id.* ¶ 82). Both Troopers fled toward the street and attempted to conceal themselves behind a pickup truck that was parked on the side of the street in front of the home. (Janosko Dep. at 87:13–20; Bobanic Dep. at 93:18–25).

The parties' respective accounts of the incident differ substantially from this point on. Kim Knight testified that Shawn Knight got up from the couch in a disoriented state. (Kim Knight Dep. at 90:7–11). She also testified that he asked her if she was okay before grabbing his guns, under the belief that someone was invading their home. (*Id.* at 90:13–21). With guns in both hands, Shawn Knight went "flying to the front door." (*Id.* at 90:17–22). Amanda, who was outside on the front porch at the time, testified during her deposition that she did not observe her father with guns in his hands as he approached the front door. (Amanda Knight Dep. at 49:23–50:2). Kim Knight, who was inside of the home at the time, testified during her deposition that Shawn Knight had a gun in each of his hands, but they were "down." (Kim Knight Dep. at 90:23–91:3). Trooper Janosko, who was retreating from the porch and was in the process of

---

[7] Even if Shawn Knight did yell these words, a jury could reasonably conclude that they are consistent with Knight believing he was confronting a home invader rather than an unidentified State Trooper.

concealing himself behind the parked pickup truck on the street, recalls Shawn Knight raising his guns at him from the doorway. (Janosko Dep. at 87:10–20, 101:11–15, 101:23–25). Trooper Bobanic testified that he recalled seeing a "half-naked man with two revolvers walking towards [his] direction," (Bobanic Dep. at 46:3–5), though it is unclear based on the provided portion of the deposition transcript whether Bobanic was describing his perception of Shawn Knight as Bobanic entered the home or after Bobanic had fled from it. It is undisputed that Shawn Knight in some fashion pushed the screen door open as he made his way toward the front porch. (Pl.'s CSF ¶ 86; Kim Knight Dep. at 92:1–5).

As Shawn Knight was in the doorway of his home, Troopers Janosko and Bobanic fired their service weapons at him without a warning. (Pl.'s CSF ¶ 87). Shawn Knight was struck by the gunfire and fell backwards into the living room of his home. (*Id.* ¶ 88). Shawn Knight never fired his weapons, (Bobanic Dep. at 93:11–13), and he later died from the gunshot wounds, (Pl.'s CSF ¶ 92).

## II.  **STANDARD OF REVIEW**

A court is to grant summary judgment if the movant shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment must be granted "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). But, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's]

-8-

position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

The moving party bears the initial burden of demonstrating that there are no genuine disputes of material fact. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362 (3d Cir. 1992) (citing *Celotex*, 477 U.S. at 323). If the moving party satisfies this burden, the opposing party must designate specific facts in the record that show that there is a genuine factual dispute to be resolved at trial. *Celotex*, 477 U.S. at 324. The non-moving party may rely on its own affidavits or on the "depositions, answers to interrogatories, and admissions on file" to designate these facts, but may not rely solely on its own pleadings. *Id.*; *see also Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989). "A fact is "material" if, under the substantive law of the case, it is outcome determinative." *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 129 (3d Cir. 1998) (citing *Anderson*, 477 U.S. at 247–48).

There are several factual disputes in this case, and the Court may not and therefore will not make findings as to those disputes. But, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). All facts and reasonable inferences will be viewed in the light most favorable to the Plaintiff, the party opposing summary judgment. *See Scott v. Harris*, 550 U.S. 372, 378 (2007). So, where the facts are in dispute, the Plaintiff's version of the events at question will be adopted. *Id.*; *see also, e.g., Martin for Estate of Webb v. City of Newark*, — F. App'x — , 2018 WL 6828424, at *3 (3d Cir. Dec. 28, 2018).[8]

---

[8] The Plaintiff produced dash cam footage of the incident, which the Court has viewed and considered. (*See* ECF No. 82). While it is plagued by poor lighting and a grainy appearance, the video plainly shows one Trooper repeatedly firing a gun as he runs backwards away from the home. The footage also shows that at least Trooper Bobanic fired his gun through the side windows of the parked pickup truck as he retreated, and Trooper Bobanic

## III. ANALYSIS

Plaintiff, Kim Knight, brings this survival action against Troopers Bobanic and Janosko pursuant to 42 U.S.C. § 1983, which may be utilized by plaintiffs alleging deprivations of their constitutional rights by those acting under color of state law. *See generally Monroe v. Pape*, 365 U.S. 167, 171–72 (1961), *overruled on other grounds by Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 189 (3d Cir. 2005) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). It is undisputed that Troopers Bobanic and Janosko, as on-duty Pennsylvania State Police officers, were acting under color of state law during the entirety of the events at issue here.

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. An excessive force claim arising "in the context of an arrest or investigatory stop of a free citizen . . . is most properly characterized as one involving the protections of the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 394 (1989), and to state an excessive force claim "a plaintiff must show that a "seizure" occurred and that it was unreasonable." *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999). A "seizure" occurs when an individual is shot by a police officer. *Id.* Excessive force

---

later confirmed during his deposition that he had done so. (Bobanic Dep. at 93:18–22). It does not appear to the Court that the footage has been altered in any way, and no party has challenged the footage's legitimacy or authenticity. However, the dash cam footage does not provide a view of the front porch of the decedent's home or a view of the decedent prior to the Defendants firing their weapons. It does demonstrate that the distance between the front porch, which appears elevated above the street level, and the Troopers was rapidly increasing as they ran backwards while firing at Shawn Knight. The video makes it appear that the scene was not well lit. No party has placed any distance measurements in the record. With respect to the differences in the parties' accounts, especially the discrepancy as to the positioning of the decedent's guns as he approached the front porch, the video does not "clearly contradict[] the version of the story told by" either party. *See Scott*, 550 U.S. at 378. Therefore, where there are facts in dispute, the Plaintiff's account of the events in question will be adopted. *Id.*

claims are analyzed under an objective reasonableness standard, *Graham*, 490 U.S. at 395, which requires a court to focus its analysis on the particular facts presented by the case as confronted by the officer. *Tennessee v. Garner*, 471 U.S. 1, 8 (1985); *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2474 (2015) ("[W]e have stressed that a court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer.").

Defendants argue that the facts in the record, viewed in the light most favorable to the Plaintiff, conclusively demonstrate that the Troopers' use of force was not unreasonable, and thus no Fourth Amendment violation occurred. Alternatively, they argue that it was not clearly established as of the date of the incident that their conduct would violate Shawn Knight's constitutional rights given the factual scenario that they encountered. The Troopers claim that they are entitled to qualified immunity on this basis.

a. Qualified Immunity Standard

Qualified immunity shields "government officials performing discretionary functions" from liability for § 1983 damages claims insofar as the officials' "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is intended to shield officers who "make reasonable but mistaken judgments about open legal questions" and provides protection for "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). The "entitlement" of qualified immunity functions as an "immunity from suit rather than a mere defense from liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis omitted).

As our Court of Appeals has recently cautioned the trial courts in this Circuit, "[q]ualified immunity, after all, protects even those officials who exercise extraordinarily poor judgment."

*Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 719 (3d Cir. 2018) (citing *al-Kidd*, 563 U.S. at 743). By the same token, qualified immunity does not apply when the facts shown by the plaintiff make out a violation of a constitutional right and the court determines that the right at issue was clearly established as of the date that the alleged violation occurred. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

A court may decide the issues in either order. *Pearson*, 555 U.S. at 236. That is, if the defendant demonstrates that the right at issue was not "clearly established" when the alleged violation occurred, a court need not consider whether a violation of a constitutional right occurred. *Id.* That said, this Court believes that it is constrained to follow the strong suggestion in Justice Kagan's Opinion for the Supreme Court in *Camreta v. Greene* and exercise its discretion in this case to first evaluate whether the right at issue was clearly established. 563 U.S. 692, 707 (2011) (urging lower courts to "think hard, and then think hard again, before turning small cases into large ones" by addressing the constitutional question prior to determining whether a right was clearly established). The underlying constitutional question here will necessarily be highly fact-bound, as the objective reasonableness of a seizure under the Fourth Amendment is evaluated under the totality of the circumstances. *See Raso*, 183 F.3d at 289. The *Pearson* Court identified this as a factor that militates in favor of a district court first deciding whether a right was clearly established. 555 U.S. at 237.[9]

b. Definition of the Right at Issue

A right is "clearly established" only if "every reasonable official would have understood that what he is doing violates th[e] right." *Zaloga v. Borough of Moosic*, 841 F.3d 170, 175 (3d

---

[9] In *Camreta*, Justice Kagan nonetheless recognized that this stated and strong preference as to the order of consideration of these issues can lead to stagnation in the development of the law because the trial court never reaches the question of whether a constitutional violation has occurred, thereby having the effect of not providing guidance to public officials as to their constitutional obligations. 563 U.S. at 706–07.

Cir. 2016) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). That is, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. In making this determination, courts look first to relevant precedent from the Supreme Court and controlling authority from the regional court of appeals. *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 248 (3d Cir. 2016). Absent controlling authority on point, a right may be "clearly established" if there is a "robust consensus of cases of persuasive authority" that describes and defines the right at issue. *Id.*; *see also al-Kidd*, 563 U.S. at 741–42. District court decisions, though not binding, may also inform this analysis. *Fields v. City of Phila.*, 862 F.3d 353, 361 (3d Cir. 2017) (citing *Doe v. Delie*, 257 F.3d 309, 321 n.10 (3d Cir. 2001)). The state of the law is analyzed as of the date that the alleged violation occurred. *Fields*, 862 F.3d at 361.

The "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (*per curiam*) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *overruled on other grounds by Pearson*, 555 U.S. at 236). The Supreme Court has repeatedly emphasized that the right at issue should not be defined "at a high level of generality." *al-Kidd*, 563 U.S. at 742. "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (*per curiam*) (internal quotations omitted) (emphasis in original). Factual specificity is particularly important in the Fourth Amendment context because it may be "difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* at 308 (quoting *Saucier*, 533 U.S. at 205); *see also Sauers*, 905 F.3d at 719.

In light of these directions from the Supreme Court and our Court of Appeals, the Court concludes that it is next obligated to define the right at issue in this case with contextual

specificity, and then survey the relevant appellate authority to discern whether that right was "clearly established" as of the date of the events here. The key evidence of record, as recounted above, primarily consists of the deposition testimony of Amanda Knight, Kim Knight, Trooper Janosko, and Trooper Bobanic. As noted above, Amanda and Kim Knight's account of the incident in the moments before the shooting differs significantly from that of Troopers Bobanic and Janosko.

Resolving all factual disputes and drawing all reasonable inferences in favor of the Plaintiff, the non-moving party, the specific context faced by Troopers Bobanic and Janosko is as follows. The Troopers arrived at the Knights' home late at night knowing that they were responding to a call for assistance relating to a report of domestic violence. Upon the Troopers' arrival, the purported victim of the incident (Amanda Knight) was outside the home, apparently uninjured, and representing to the Troopers that the situation was "fine" and that she was planning on removing herself from the home by staying in a hotel for the night. Kim Knight, the wife of the alleged perpetrator, concurred with her daughter, told the Troopers that she did not want them to come into her home, and shut the front door to try and prevent their entry. Trooper Bobanic ignored Kim Knight's protestations and forced his way inside of the residence. He had neither a warrant nor consent to do so. Shortly after entering the home, Trooper Bobanic saw two guns lying on a coffee table next to Shawn Knight, who was asleep on the living room couch.[10]

---

[10] Whether Shawn Knight was asleep at the time is disputed by the parties. Trooper Bobanic testified during his deposition that he heard someone inside of the home, supposedly Shawn Knight, tell him "in a loud voice" to "get out of [his] house" as Bobanic entered the house. (Bobanic Dep. at 52:2–14). Trooper Bobanic also testified that he saw a "half-naked man with two revolvers walking toward [his] direction," (*id.* at 46:3–5), but it is unclear based upon the excerpt of the deposition transcript that was provided as an exhibit whether Bobanic was describing his perception of Knight upon Bobanic's entry into the home, or after Bobanic had already retreated. Kim Knight testified at her deposition that Shawn Knight was asleep when Trooper Bobanic entered the home. (Kim Knight Dep. at 82:10–12). In the Court's estimation, had Trooper Bobanic heard Shawn Knight warn him to leave his home, or had Shawn Knight been awake and armed when Trooper Bobanic entered the Knight's home, it would have tended to make Bobanic's belief that Shawn Knight posed an imminent threat more reasonable. It is undisputed that Shawn Knight had guns in plain view next to his couch, Bobanic knew he was responding to a report of a domestic

-14-

Trooper Bobanic immediately shouted "guns" and turned to rapidly exit the residence. A jury could conclude that as he entered the home Trooper Bobanic awoke Shawn Knight. Troopers Bobanic and Janosko then retreated from the front porch of the home.

Neither Trooper Bobanic nor Trooper Janosko deployed their lights or siren as they approached the Knights' home, and Trooper Bobanic did not announce that he was a police officer as he entered the Knights' home or at any time while he was inside. Trooper Janosko likewise did not verbally announce that he was a police officer at any time, and neither Trooper has advanced record evidence as to why they did not do so. Because Shawn Knight had been asleep when the police arrived, and because the Troopers did not identify themselves as police officers, a jury could reasonably conclude that Shawn Knight believed that his home was being invaded, and that in order to protect his family and home, Shawn Knight grabbed his handguns and rapidly approached the front door of his home to investigate, and if necessary, repel any invaders.[11]

It is undisputed that Shawn Knight had a gun in each hand as he approached the front door of his home, but it is hotly disputed as to whether Shawn Knight had "drawn" or "pointed" his weapons prior to Troopers Janosko and Bobanic opening fire. Kim Knight was inside of the

---

violence incident, and that Shawn Knight approached the front door at a high rate of speed while armed after Bobanic exited. If Shawn Knight had warned the officers to leave his home, or was already awake and armed when Bobanic entered the home, the Troopers might have reasonably concluded that Shawn Knight might next act violently (even if only in a legitimate but unfounded effort to defend his home), and might have interpreted his rapid approach to the front door of the residence as a chase with the intent to inflict harm. But, the Court may not engage in these hypotheticals, since under the law, all factual disputes are resolved in favor of the Plaintiff. Therefore, the Court will assume for the purposes of this Motion that Shawn Knight was asleep at the time that Trooper Bobanic entered the home and did not tell Trooper Bobanic to "get out of [his] house," or anything else for that matter. Relatedly, the Court must assume for the purposes of this Motion that Trooper Bobanic had not heard a warning or threat from Shawn Knight prior to Trooper Janosko and Bobanic shooting him. This account is more favorable to the Plaintiff because, under Kim Knight's account, Shawn Knight would have posed a less imminent threat to the Troopers, potentially making their application of deadly force less reasonable.

[11] But, Shawn Knight's subjective belief that his home was being invaded by unknown intruders is not material to the qualified immunity question because a court may "consider[] only the facts that were knowable to the defendant officers." *White v. Pauly*, 137 S. Ct. 548, 550 (2017) (*per curiam*) (citing *Kingsley*, 135 S. Ct. at 2474).

home at the time. She acknowledged during her deposition that Shawn Knight had guns in each of his hands as he "flew" toward the front door, but further testified that the guns were "down" as he did so. (Kim Knight Dep. at 90:23–91:3). Amanda Knight, who was on the porch at the time, did not observe her father carrying weapons as he approached the front door. (Amanda Knight Dep. at 49:23–50:2). She did concede, however, that he must have been holding the guns because she noticed they were lying in front of her father rather than on the coffee table after her father was shot. (*Id.* at 49:8–22). Trooper Janosko, on the other hand, claimed that "Shawn Knight was on the porch raising his pistols at [him]," (Janosko Dep. at 101:11–15), and Trooper Bobanic testified at his deposition that he "saw a half-naked man with revolvers, one in each hand," (Bobanic Dep. at 46:10–11). Janosko testified that when examined after the shooting, one of the revolvers had its hammer cocked. (Janosko Dep. at 106:3–8).

There is no record evidence that Trooper Janosko or Bobanic gave any warning or verbal command for Shawn Knight to drop his weapons (or to do or not do anything else) prior to the Troopers opening fire, and the dash cam footage of the incident plainly shows that the Troopers fired their service weapons without appreciable hesitation as they swiftly retreated backwards away from the house. Thus, for the purposes of this Motion, the Court must thus assume that no warning or command was given to Shawn Knight prior to the Troopers discharging their weapons and killing him. That being said, swift police action in this situation would not be *per se* unreasonable. To justify the use of deadly force, an officer must have good reason "to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Lamont v. New Jersey*, 637 F.3d 177, 183 (3d Cir. 2011) (quoting *Garner*, 471 U.S. at 3). And, a Court must consider the "totality of the circumstances leading up to the shooting" in a case such as this. *Johnson v. City of Phila.*, 837 F.3d 343, 350 (3d Cir. 2016). If the

circumstances confronted by the Troopers gave them a legitimate reason to fear for their safety or the safety of others, then it is plausible that a jury at trial would conclude that their immediate shooting of Shawn Knight may have been reasonable.

This underscores why the positioning of Shawn Knight's weapons is important in this case. Just prior to the shooting, the Troopers indisputably knew that Shawn Knight was suspected of domestic violence, armed, and quickly approaching in their direction from inside the front door of his home. In the Court's estimation, these circumstances could reasonably support an inference that a violent encounter was imminent and that Shawn Knight would engage in it using firearms. But, the positioning of his weapons bears on the *immediacy* of the threat he posed, and consequently bears on the reasonableness of the Troopers' immediate resort to deadly force. Had Shawn Knight approached the porch with his guns at his side he would have posed a serious but less imminent threat than if his guns were drawn, and alternative courses of actions may have been safely contemplated and pursued by the Troopers. Conversely, if Shawn Knight had his weapons "drawn" and at the ready, then an immediate resort to deadly force could have been a more reasonable course of action to protect the safety of everyone on the scene. *See Long v. Slaton*, 508 F.3d 576, 581 (7th Cir. 2007) ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect.").

There is an additional fact that is undisputed, however, and it is central to the positioning of Shawn Knight's weapons as he was exiting his home. Everyone who testified acknowledged two things during their depositions: 1) Shawn Knight was holding a revolver in each hand; and 2) Shawn Knight opened the screen door that led to the front porch from inside the home. For him to push that screen door open, he would have needed to raise one of his hands, which was

-17-

holding a revolver, at least slightly.[12] Thus, it appears to the Court that it is undisputed that Shawn Knight raised a hand holding one of his weapons to some degree, even if just for a moment. Drawing all inferences and disputed facts in favor of the Plaintiff, the Court will assume that Shawn Knight approached the front door at a rapid pace, with guns in each of his hands, and he raised to at least a slight degree, but did not aim, one of the guns. This scenario comports with the undisputed facts in the case, as well as Kim and Amanda Knight's recollections as recounted during their depositions.

Heeding the Supreme Court's recent admonitions to the trial courts, considering the above material facts (both undisputed and those that are disputed as viewed in favor of Plaintiff) the Court formulates the right at issue as follows: the right of an individual to be free from the infliction of deadly force by a police officer, where such deadly force was employed without warning or hesitation from the officer, and where the individual himself is in his home, lawfully armed, suspected of domestic violence, has raised at least slightly (but not aimed) one of his weapons, as he was quickly approaching the officers from the interior of his home.[13]

---

[12] Kim Knight testified during her deposition that Shawn Knight pushed open the screen door with his left hand. (Kim Knight Dep. at 92:1–5). Trooper Janosko testified that the front "screen door" (which was in reality a "full glass door") came flying open and Shawn Knight presented as a "middle-aged white male who was only wearing shorts" who held the door open with his shoulder. (Janosko Dep. at 7:15–17, 97–99).

[13] Following the very strong hint in *Camreta* to avoid adjudicating whether the asserted Constitutional right was violated, this Court does not reach a conclusion as a matter of law as to whether a police officer who employed deadly force in such a situation would or would not necessarily violate an individual's rights under the Fourth Amendment. For the "clearly established" prong of qualified immunity analysis, the law directs that the right at issue be framed by the specific facts of the case. *See, e.g., Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638–39 (3d Cir. 2015), *cert. denied*, 136 S. Ct. 1162 (2016) (defining the right at issue as the right of "a student who experiences a brief submersion under water, exits the pool and complains of chest pain, is ordered to return to the pool after a several-minute respite, then stays in the shallow end of the pool for the remainder of the class, and does not exhibit signs of serious distress until more than one hour later" to "affirmative action by [a] state actor to minimize the risk of secondary or dry drowning"). So, for qualified immunity purposes, the issue for the Court at this juncture is not whether the Defendants violated Shawn Knight's constitutional rights given the facts they encountered, but rather the issue is whether the other relevant courts have held, under very similar circumstances, that a constitutional violation occurred. *See Brosseau*, 543 U.S. at 199–200. That said, given the abundance of disputed facts in this case, the reasonable inferences that could be drawn in Plaintiff's favor, coupled with the lack of any warning given, or identification provided, by the Troopers and the ultimate constitutional question being one of "objective reasonableness," the Court has little difficulty concluding that a reasonable jury *could* conclude that the

### c. Supreme Court Precedent

All excessive force claims, including those involving deadly force, are evaluated under the Fourth Amendment's "reasonableness" test. *Scott*, 550 U.S. at 382. It is long-settled that "[t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Such an analysis must account "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

*Saucier v. Katz* discussed the interplay between qualified immunity and excessive force claims in depth. 533 U.S. 194 (2001). The Supreme Court acknowledged some apparent superficial inconsistency that arises when a court determines that an officer used excessive force—based on an objective "reasonableness" analysis under *Graham*—but yet holds that the officer is entitled to qualified immunity because he "reasonably acted unreasonably." *Id.* at 203 (quoting *Anderson v. Creighton*, 483 U.S. 635, 643 (1987)). Nonetheless, whether a constitutional violation occurred and whether qualified immunity applies remain distinct inquiries after *Graham*. *See Kedra v. Schroeter*, 876 F.3d 424, 449 n.19 (3d Cir. 2014) (citing *Saucier*, 533 U.S. at 204). Qualified immunity has a "further dimension" beyond *Graham*'s objective reasonableness test—it accounts for situations where an officer may correctly perceive the circumstances he encounters and mistakenly, but reasonably, applies excessive force due to an uncertainty as to what the law permits in those circumstances. *Saucier*, 533 U.S. at 205–06.

---

Troopers violated Shawn Knight's constitutional rights. But for the application of qualified immunity, this case would proceed to trial.

For this reason, "the law must be elaborated from case to case" in order to put "officers on notice their conduct is unlawful." *Id.* at 206.[14]

The Supreme Court addressed the use of deadly force in the context of apprehending a fleeing felony suspect in *Garner* and held that it was "constitutionally unreasonable" to permit the use of deadly force to apprehend *all* fleeing suspects and that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." 471 U.S. at 11. But, "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11–12.

As later explained by the Supreme Court, "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute "deadly force." *Garner* was simply an application of the Fourth Amendment's "reasonableness" test." *Scott*, 550 U.S. at 382. Along those same lines, in recent years the Supreme Court has repeatedly and unequivocally emphasized that "the general rules set forth in *Garner* and *Graham* do not by themselves create clearly established law outside an obvious case." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (*per curiam*) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (*per curiam*)) (internal quotation marks omitted); *see also Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (reiterating that "*Garner* and *Graham* . . . are cast at a high level of generality") (quoting

---

[14] *Saucier* cannot and does not clearly establish the right at issue here. The Supreme Court only granted review in that case as to whether qualified immunity applied and assumed *arguendo* that a constitutional violation occurred. *Saucier*, 533 U.S. at 207–08. The Supreme Court further concluded that the right at issue was not clearly established and the officer was entitled to qualified immunity. *Id.* at 209. More importantly, the facts of *Saucier* are completely different than in this case. *Saucier* did not involve the infliction of deadly force and arose out of an allegedly rough arrest of a protestor by military police. *Id.* at 198.

*Brosseau*, 543 U.S. at 199). The Supreme Court's direction is clear. When it comes to answering the "clearly established" question, *Garner* and *Graham* provide the general principles and legal framework—but their ability to "clearly establish" Fourth Amendment rights are just as constrained to the facts presented in their cases as any other case. The facts of a case need not be "directly on point for a right to be clearly established," *White*, 137 S. Ct. at 551, but recent decisions of the Supreme Court demonstrate that there must be substantial factual similarity for "existing precedent" to "have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

The facts of *Garner* are not sufficiently analogous so as to have clearly established the right at issue here. In *Garner*, a police officer shot a fleeing, unarmed suspect of a robbery as he was attempting to scale a chain link fence to elude capture. 471 U.S. at 3. The suspect was shot only to prevent his escape and not because he was perceived to pose a threat to the officers on the scene or bystanders. *Id.* at 21. Here, by contrast, the decedent *was* armed and was advancing *toward* the officers, which is plainly a more threatening situation.

Those facts are also sufficient to distinguish *Garner* in another important sense. The *Garner* Court held that "deadly force may be used if necessary to prevent escape" "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm . . . and if, where feasible, some warning has been given." *Id.* at 11–12. But here, the decedent was not fleeing or attempting escape. Other courts have recognized that the reasonableness inquiry of utilizing deadly force is different in the context of officer self-defense as opposed to preventing escape. *See, e.g.*, *Plakas v. Drinski*, 19 F.3d 1143, 1146–47 (7th Cir. 1994) ("This is not a case where an officer claims to have used deadly force to prevent an escape. It is a self-defense case where the

officer has "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer" and, therefore, the officer may use deadly force.") (quoting *Garner*, 471 U.S. at 3). The Court is also not aware of any Supreme Court case that has since defined those circumstances in which a warning prior to the infliction of deadly force is required, or what it means to be "feasible" to give a warning so as to "clearly establish" the law in such regards, particularly in situations where, as here, an armed suspect is rapidly advancing toward the officers as opposed to fleeing from them.[15] That said, given the facts that are undisputed, the Troopers' failure to give any warning before entering the home or opening fire, or to even identity themselves to Shawn Knight, or to offer an explanation as to why they did not do any of these things, would certainly weigh heavily in the determination of the "objective reasonableness" of their conduct. But, as explained, whether a right was "clearly established" is a distinct inquiry from whether that right was violated. *Kedra*, 876 F.3d at 449 n.19. And while it certainly appears to the Court that a jury could reasonably conclude that it was "feasible" as a factual matter for the Troopers to give Shawn Knight some warning as to their identity as they entered his home and/or before they began firing their weapons at Shawn Knight, given the limitations the Supreme Court itself has put on *Garner* as announcing a "clearly established"

---

[15] Nor is there a "robust consensus" of persuasive authority so as to clearly establish under what conditions (outside of the specific conditions presented by a given case) a warning is or is not to be considered feasible for qualified immunity purposes. Lower federal courts have applied the "where feasible" language from *Garner* in analyzing police use of deadly and non-deadly force. *See* Brandon Garrett & Seth Stoughton, *A Tactical Fourth Amendment*, 103 Va. L. Rev. 211, 296 (2017) (citing *Mattos v. Agarano*, 661 F.3d 433, 451 (9th Cir. 2011) (*en banc*); *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010); *Floyd v. City of Detroit*, 518 F.3d 398, 409 (6th Cir. 2008); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007)). These and other cases are discussed in Section III.e. below. Undoubtedly, all of these cases indicate that the presence or absence of a warning bears on the reasonableness of an officer's use of force. However, the Court is unaware of any cases that turn specifically on whether a warning was given or of any cases that provide clear direction as to under what conditions, generally, a warning is "feasible." Further, all of the cases cited by Professors Garrett and Stoughton are factually distinguishable from this case in material ways. Although other courts have held that an officer's failure to give warning was a relevant factor in finding that a particular use of force was unreasonable given the totality of the circumstances encountered by *that officer*, this case presents different circumstances so these cases do not and cannot "clearly establish" the right at issue in this case.

rule, this Court, in the absence of direction from a controlling appellate court, for the reasons set out below, cannot conclude that this is a case so "obvious" as to the lack of officer identification or a warning such that *Garner* fulfills that role.

In recent years, the Supreme Court has issued a number of opinions resolving excessive force claims under § 1983 on the basis of qualified immunity. *See, e.g.*, *City of Escondido v. Emmons*, 139 S. Ct. 500 (2019) (*per curiam*); *Kisela v. Hughes*, 138 S. Ct. 1148 (2018) (*per curiam*); *White v. Pauly*, 137 S. Ct. 548 (2017) (*per curiam*); *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765 (2015); *Mullenix v. Luna*, 136 S. Ct. 305 (2015) (*per curiam*); *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014). The most analogous case is likely *White*.[16] Similar to this case, the officer in *White*, without first giving a warning, shot an armed individual who had appeared in and opened a window in the front of his home. 137 S. Ct. at 550. Also, as in this case, the decedent in *White* was under the impression that the police outside of his home were would-be home intruders, and the decedent did not fire his own weapon before he was shot. *Id.* at 549–50. Under these facts, the Supreme Court granted the petition for writ of certiorari and summarily vacated the Tenth Circuit's holding that the officer was not entitled to qualified immunity. *Id.* at 551.

Several facts in *White* arguably make the officer's actions more reasonable there than the Troopers' actions in this case. First, the officer who fired his weapon in *White* arrived on the scene sometime after the two other officers, and to this point the Supreme Court observed that "[c]learly established federal law does not prohibit a reasonable officer who arrives late to an ongoing police action in circumstances like this from assuming that proper procedures, such as

---

[16] Only cases decided prior to the events giving rise to a case can "clearly establish" the rights at issue. *Fields*, 862 F.3d at 361. The Supreme Court cases decided after June 28, 2013, cited and discussed herein are provided as illustrative examples of the current state of the law of qualified immunity and its relation to excessive force claims. Even if these cases clearly establish rights under the Fourth Amendment (they do not), they could not be cited as authority clearly establishing the rights at issue in this case.

officer identification, have already been followed." 137 S. Ct. at 552. Here, both Troopers arrived at the same time and there is no record evidence that either Trooper was ignorant of how the incident unfolded. Second, another individual in *White* had fired a shotgun on the other side of the home just prior to the decedent appearing in, and opening, a window in the front of the home, *id.* at 550, while it is only the State Trooper Defendants in this case that discharged their weapons. These facts are both relevant to an officer's perception of the threat that the armed individual may have posed as he opened the window of his home, and in this Court's estimation, could justifiably support a conclusion that the threat was more immediate in *White* than the threat that the Defendants faced here. But, the Supreme Court agreed with the Tenth Circuit's observation that Officer White's failure to shout a warning before he shot and killed the decedent was not a "run-of-the-mill" Fourth Amendment violation such that it "obviously" violated generally applicable and settled provisions of constitutional law under *Garner* and *Graham*. *Id.* at 552. Likewise, this Court cannot conclude that it would have been "obvious" as announced by then-established law (as of June 28, 2013) that the Troopers were obligated to have identified themselves as Troopers or to have given a warning here prior to firing their weapons, no matter that a reasonable jury could conclude that it would have been "feasible" for them to have done so.

The first two of these factors were not dispositive in the Supreme Court's decision. That is, the right at issue in *White* would not have been clearly established *but for* the officer's late arrival or *but for* the fact that someone else on the scene had already fired a weapon. Nor did the Supreme Court in *White* conclude that it had already been clearly established that Officer White was obligated to identify himself as a police officer or give a warning before shooting the decedent to death, and did not use *White* as a vehicle to announce that rule. And, it bears

-24-

repeating that *White* was not a close case for the Supreme Court—it was decided without merits briefing or oral argument.[17] In the Court's estimation, *White* is a particularly relevant example of the Supreme Court's insistence on a high degree of specificity and factual overlap between a case *sub judice* and the relevant prior precedent if a § 1983 plaintiff bringing an excessive force claim is to overcome the qualified immunity hurdle, even when the official conduct results in death and no warning has been given. *See White*, 137 S. Ct. at 522. The Supreme Court decided in 2017 that the Fourth Amendment rights relative to the conduct of a later-arriving officer as implicated by the facts in *White* were not clearly established as of October, 2011, including as to a failure to give a warning before exercising deadly force.[18] At minimum, this tends to suggest that Plaintiff in this case has a steep path to demonstrate that there was more clarity regarding the rights at issue in this case as of June, 2013, based only on a limited number of distinguishing facts and a less-than-two-year gap between the events in *White* and the events in this case.

On remand in *White*, the Tenth Circuit confirmed—while adhering to the Supreme Court's directives—that Officer White was entitled to qualified immunity because the state of the law in 2011 could not have sufficiently placed him on notice as of the date of the incident

---

[17] One scholar has recently observed that the Supreme Court has seemingly focused on the improper failure to apply (or much more rarely, the improper application of) qualified immunity as a type of error that has "been targeted for repeated attention by the Court's summary reversal docket." *See* William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 84–86 (2018). Since 2005, the Supreme Court has summarily reversed a lower court's failure to grant an officer qualified immunity nine times. *City of Escondido v. Emmons*, 139 S. Ct. 500 (2019) (*per curiam*); *Kisela v. Hughes*, 138 S. Ct. 1148 (2018) (*per curiam*); *White v. Pauly*, 137 S. Ct. 548 (2017) (*per curiam*); *Taylor v. Barkes*, 135 S. Ct. 2042 (2015) (*per curiam*); *Mullenix v. Luna*, 136 S. Ct. 305 (2015) (*per curiam*); *Carroll v. Carman*, 135 S. Ct. 348 (2014) (*per curiam*); *Stanton v. Sims*, 571 U.S. 3 (2013) (*per curiam*); *Ryburn v. Huff*, 565 U.S. 469 (2012) (*per curiam*); *L.A. Cty. v. Rettele*, 550 U.S. 609 (2007) (*per curiam*); *see also* Edward A. Hartnett, *Summary Reversals in the Roberts Court*, 38 Cardozo L. Rev. 591, 595 (2016). Only twice during that period did the Supreme Court summarily reverse a lower court's decision to *grant* qualified immunity. *Hernandez v. Mesa*, 137 S. Ct. 2003 (2017) (*per curiam*); *Tolan v. Cotton*, 572 U.S. 650 (2014) (*per curiam*). The trend of summary reversals of lower courts denying qualified immunity appears to be increasing in frequency. Solely in the context of excessive force claims under the Fourth Amendment, the Supreme Court has summarily reversed a lower court's refusal to apply qualified immunity in § 1983 cases four times since 2015 (*Emmons*, *Kisela*, *White*, and *Mullenix*).

[18] The date of the underlying incident in *White v. Pauly* is provided in the Tenth Circuit's first Opinion. *See Pauly v. White*, 814 F.3d 1060, 1064 (10th Cir. 2016).

that his conduct may have been unconstitutional given the situation that he confronted. *Pauly v. White*, 874 F.3d 1197, 1222–23 (10th Cir. 2017) ("*Pauly II*") (granting the defendant qualified immunity because the court could not "identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment") (quoting *White*, 137 S. Ct. at 552). Thus, Officer White was not liable for his conduct despite the Tenth Circuit also concluding that there was a fact issue as to whether his infliction of deadly force was objectively unreasonable and violated the Fourth Amendment in relevant part because: (1) White did not have probable cause to believe that the decedent posed an immediate threat of serious harm to himself or anyone else on the scene, and (2) White did not give a warning prior to opening fire. *Pauly II*, 874 F.3d at 1221–22. Notably, the fact that Officer White did not order the decedent to drop his weapon or otherwise give a warning prior to shooting was discussed as a factor "clearly support[ing]" this conclusion. *Id.* at 1216. But critically, the Tenth Circuit's conclusion that White was entitled to qualified immunity, in this Court's estimation, further underscores just how unsettled the state of the law was and is in excessive force cases generally, and as to any obligation to issue a warning in particular.[19] Thus, *Pauly II* is of little help to Plaintiff here. And even though the Tenth Circuit concluded that it could be found that White *did* act unreasonably, *Pauly II* was not decided until October 31, 2017, over four years after the events at issue in this case. So, *Pauly II* cannot be relied upon as authority "clearly establishing" anything as of June 28, 2013, the date of the underlying incident in this case. *See Fields*, 862 F.3d at 361.

---

[19] This cogently illustrates Justice Kagan's observation that the focus on the "clearly established" prong can lead to "stagnation" in the development and announcement of the contours of constitutional obligations of public officials. As set out below, there are a number of cases involving the application of deadly force without a warning, yet none that plainly "establish" the constitutional "rules of the road" in such circumstances.

The Court is aware of only two recent cases in which the Supreme Court reversed a lower court's grant of qualified immunity: *Hernandez v. Mesa*, 137 S. Ct. 2003 (2017) (*per curiam*), and *Tolan v. Cotton*, 572 U.S. 650 (2014) (*per curiam*). Neither are of help to the Plaintiff here. The reversal of the lower court's denial of qualified immunity in *Hernandez* was on very narrow grounds. The Supreme Court determined that the court of appeals had improperly relied on facts that were unknowable to an officer (the victim's nationality) in holding that the officer was entitled to qualified immunity for shooting a Mexican national across the U.S.-Mexico border. 137 S. Ct. at 2007. The Supreme Court did not determine whether qualified immunity should have been applied, and instead remanded the case to the court of appeals to answer the qualified immunity question considering only facts that were knowable to the defendant officer. *Id.* at 2007–08.

In *Tolan*, a police officer misidentified an individual as someone who had stolen a car. 572 U.S. at 651–62. The police officer drew his weapon and ordered the individual to the ground when he parked his car at his parents' home. *Id.* The resulting commotion brought his parents outside, and despite their protestations of their son's innocence, the parents were ordered to stand against their garage door. *Id.* at 652–53. The mother refused, and her son then got up from where he was lying. *Id.* The police officer shot him without warning and despite him being unarmed. *Id.* at 653.

Similarly to *Hernandez*, the basis of the Supreme Court's reversal of the Fifth Circuit's grant of qualified immunity was on the narrow ground that the Fifth Circuit did not resolve all factual disputes in favor of the plaintiff, *Tolan*, 572 U.S. at 659, and in any event, the Supreme Court did not hold that the right at issue was clearly established. *Id.* at 660. But even if it were, *Tolan* is materially different from this case. Most pertinently, Shawn Knight was indisputably

armed with two guns during the encounter, which bears directly on the reasonableness of the officer's perception of the seriousness of the threat he may have posed. The Supreme Court also did not express a view as to whether the officer's actions in *Tolan* violated clearly established law, *id.*, nor would such a determination be relevant in this case because *Tolan* was decided after the events at issue here. *Fields*, 862 F.3d at 361. Likewise, the events in *Hernandez* post-date the events at issue here, and the Supreme Court did not hold that the officer in *Hernandez* violated clearly established law. *Hernandez*, 137 S. Ct. at 2007–08.

In sum, the Court concludes that there is no precedent from the Supreme Court that clearly established the precisely defined right at issue in this case as of June 28, 2013. Recent guidance from the Supreme Court is clear that a right at issue must be precisely defined within the context of the facts that an officer encountered, and that this is especially true for excessive force claims, claims as to which the Supreme Court has repeatedly summarily admonished the federal trial courts for failing to very narrowly and precisely define the right at issue. While *Graham* and *Garner* provide the relevant tests and frameworks, for the right at issue in this case to be "clearly established," other appellate courts first must have held "under facts not distinguishable in a fair way from the facts presented in the case at hand" that similar conduct as exhibited by the Troopers here was a constitutional violation. *Saucier*, 533 U.S. at 202.

d. Third Circuit Precedent

The Court next turns to the precedent of our regional Court of Appeals, the Third Circuit, to determine whether the right at issue was clearly established. *Sch. Dist. of Phila.*, 836 F.3d at 248. Plaintiff provided only one comparator case, *Curley v. Klem*, 298 F.3d 271 (3d Cir. 2002), for this purpose.

-28-

In *Curley*, a police officer, Officer Klem, shot another police officer, Officer Curley, after pursuing a murder suspect and apparently confusing Officer Curley with the suspect. 298 F.3d at 273–74. The shooting took place following a vehicular pursuit of the suspect. *Id.* at 274–75. The suspect was described as either a "tall, black male" or a "thin, black male" who had carjacked a green Toyota Camry and collided with another vehicle during the chase. *Id.* at 274. Unbeknownst to Officer Klem, the suspect committed suicide after the accident and his body was sprawled across the front seat of the vehicle. *Id.* at 275. It was disputed whether Officer Klem looked into the vehicle as he arrived on the scene. *Id.*

Officer Curley was a 6'4" African-American man and Port Authority police officer. *Curley*, 298 F.3d at 275. He was present at the scene of the accident and wearing his standard Port Authority police uniform. *Id.* Officer Curley claimed that he began running toward the crashed vehicle to investigate, but then began to back-pedal when he realized that he had no cover from a potential attack from the suspect. *Id.* at 276. He claims that he was shot by Officer Klem as he was retreating. *Id.* Officer Curley admitted that he had his gun raised as he approached the suspect's crashed car, but had never pointed the gun at Officer Klem or anyone else. *Id.*

The Third Circuit reversed the district court's grant of qualified immunity at the summary judgment stage because of the material factual disputes in the case. *Curley*, 298 F.3d at 283. However, the Third Circuit did not hold that qualified immunity would have applied had Officer Curley's account of the incident been credited—rather, it concluded that the district court erred in how it erroneously resolved the factual disputes in Officer Klem's favor and that the factual disputes needed to be resolved at trial prior to a court determining whether the rights at issue were clearly established. *Id.*

However, even had the Third Circuit determined that the rights at issue in *Curley* were clearly established,[20] that case presented a materially different factual scenario such that it would not clearly establish the rights at issue in this case. The Third Circuit identified two "key issues" in the case—whether Officer Klem had looked inside of the crashed vehicle prior to shooting Officer Curley and whether Officer Curley had pointed his gun at Officer Klem during the encounter. *Curley*, 298 F.3d at 281–82. Neither issue was dispositive, and the Third Circuit also noted that Officer Curley was wearing his Port Authority police uniform during the encounter and was not behaving in a way typical of a murder suspect. *Id.* at 280.

In this Court's estimation, *Curley* was a case of mistaken identity and the *Curley* court focused on the actions that Officer Klem took (or failed to take) in ascertaining the identity and status of the suspect that he was pursuing. Officer Klem supposedly shot Officer Curley because he (Klem) believed that Curley was an armed and dangerous murder suspect. But Klem arrived at this deduction without looking inside of the suspect's vehicle that he was pursuing (where he would have seen the already-dead murder suspect) and despite Officer Curley *retreating* from the scene while wearing his Port Authority police uniform. *All* of these factors would be relevant in determining whether Officer Klem's conduct was reasonable in the "totality of the circumstances" that he confronted. *See Curley*, 298 F.3d at 279 (quoting *Raso*, 183 F.3d at 289). By contrast, in this case, Shawn Knight was exactly the individual that the Troopers believed that he was, namely, a now-armed private citizen suspected of engaging in domestic violence, rushing out of his home in their direction with a gun in each hand. The factual overlap between

---

[20] *Curley* proceeded to trial and the jury, through special interrogatories, resolved the factual disputes identified by the Third Circuit and further found that Officer Klem's mistake in firing his weapon was objectively reasonable under the circumstances. *Curley v. Klem*, No. CIVA298CV05256, 2006 WL 414093, at *3 (D.N.J. Feb. 21, 2006). Officer Curley's motion for a directed verdict and/or new trial was denied, *id.* at *6, and Officer Curley appealed. 499 F.3d 199 (3d Cir. 2007). The Third Circuit upheld the district court's verdict "on the ground that no constitutional violation occurred." *Id.* at 216.

*Curley* and this case is the fact of a dispute about the exact positioning of the victim's gun when he was shot, but the Third Circuit did not hold that that factual dispute was dispositive of the definition of the involved right. Thus, the Court concludes that because Shawn Knight was rapidly advancing in the direction of the Troopers, while holding two guns as he exited his house, along with the lack of doubt as to who he was (a suspect in a domestic violence episode), the facts of *Curley* are "distinguishable in a fair way from the facts presented in the case at hand," *Saucier*, 533 U.S. at 202, so *Curley* does not "clearly establish" the right at issue here.

The Court's independent research on this issue also supports the conclusion that the specific right at issue here was not clearly established on the night Shawn Knight was shot. By way of background, Third Circuit cases from the early 2000s analyzed excessive force claims using the following non-exhaustive factors:

> the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight ... [whether] the physical force applied was of such an extent as to lead to injury ... the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

*Estate of Smith v. Marasco*, 430 F.3d 140, 150 (3d Cir. 2005) (quoting *Sharrar v. Felsing*, 128 F.3d 810, 821–22 (3d Cir. 1997), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199 (3d Cir. 2007)). An officer is not entitled to qualified immunity if he "applies the *Sharrar* analysis in an unreasonable manner." *Smith*, 430 F.3d at 150. This Court harbors doubt as to the continued vitality of the application of a multi-factor "clearly established" right test as formulated by *Smith* in light of recent cases from the Supreme Court and Third Circuit that emphasize that rather than considering a generally applicable test, the "legal principle [must]

-31-

clearly prohibit the officer's conduct *in the particular circumstances before him.*" *Bland v. City of Newark*, 900 F.3d 77, 83 (3d Cir. 2018) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)) (alterations in original, emphasis added). That is, under current law, the Court cannot simply analyze the Troopers' conduct applying the *Sharrar* factors in a general sense, determine *ex post* that the Troopers may have unreasonably applied those factors, and then deny qualified immunity. Even though "general statements of law are not inherently incapable of giving fair and clear warning to officers" the "unlawfulness [of the officer's conduct] must be apparent" based on the state of the law. *White*, 137 S. Ct. at 552 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). Thus, this Court understands that—outside of a case where the illegality of an officer's conduct is so obvious that a "general statement of the law" provides a sufficient warning—*Smith* nonetheless still requires some precedent that has held that, under facts substantially similar to the case at bar, an officer "applie[d] the *Sharrar* analysis in an unreasonable manner," *Smith*, 430 F.3d at 150, for the right to be "clearly established" for qualified immunity purposes. Else, the qualified immunity and liability determination would be collapsed into a single inquiry and eliminate the possibility of qualified immunity for "reasonably unreasonable" constitutional violations, which has been deemed an acceptable test by the Supreme Court since at least 1987. *See Creighton*, 483 U.S. at 643. Based on the Supreme Court and Third Circuit precedent discussed above, the Court cannot conclude that the Troopers' conduct here was so blatantly and obviously unconstitutional such that a general statement of the law would have provided a sufficient warning to every reasonable police officer in the Troopers' shoes as they encountered Shawn Knight on June 28, 2013.[21] The Court is aware of no

---

[21] Such general statements of the law can provide a sufficient warning, even under novel facts, in particularly egregious cases. *See, e.g.*, *Hope v. Pelzer*, 536 U.S. 730 (2002) (no qualified immunity in situation where an inmate was handcuffed to an outdoor hitching post for seven hours without water or bathroom breaks); *Kane v. Barger*, 902 F.3d 185, 194–95 nn. 48, 51 (3d Cir. 2018) (holding that there was no qualified immunity in situation where a jury

sufficiently factually analogous Third Circuit authority refining the contours of the right at issue here and then clearly announcing it, and for these reasons concludes that the controlling authority from our Court of Appeals had not clearly established the right at issue here as of June 28, 2013.

e. Robust Consensus of Persuasive Authority

Finally, the Court cannot conclude that a "robust consensus" of persuasive authority clearly established the right at issue in this case. Two non-precedential opinions from the Third Circuit held that qualified immunity did not apply in similar, but legally and factually distinguishable, situations.[22] In *Bennett ex rel. Estate of Bennett v. Murphy*, an officer shot and killed a suicidal individual who was holding a shotgun at his own head and had never pointed the gun at anyone else on the scene. 120 F. App'x 914, 916 (3d Cir. 2005). Police officers had surrounded the individual and were engaged in an hour-long standoff prior to one of the officers, from eighty feet away, shooting and killing the individual. *Id.* The Third Circuit had decided in an earlier Opinion in that case that the individual did not "pose[] an immediate threat to anyone but himself," and thus concluded that the officer was not entitled to qualified immunity because it was clearly established that "[l]aw enforcement officers may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed." *Id.* at 918 (quoting *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997)). Here, however, it is undisputed that the situation unfolded in a matter of seconds rather than in an hour-long standoff.

---

could conclude that an investigating police officer photographed and inappropriately touched a victim of sexual assault without her consent and for his own personal gratification).

[22] Non-precedential opinions of the Third Circuit are not binding on this Court. *See United States v. Nagle*, 803 F.3d 167, 182 n.9 (3d Cir. 2015) (citing 3d Cir. Internal Operating Procedure 5.7). Because they are not "controlling authority," these decisions by themselves could not "clearly establish" any rights at issue for qualified immunity purposes. *See Sch. Dist. of Phila.*, 836 F.3d at 248. However, non-precedential opinions may still be cited as persuasive authority. *Prudential Prop. & Cas. Ins. Co. v. Jefferson*, 185 F. Supp. 2d 495, 499 n.1 (W.D. Pa. 2002). Thus, non-precedential opinions of the Third Circuit have value in the qualified immunity assessment insofar as they could potentially contribute to a "robust consensus of persuasive authority" clearly establishing the right at issue. *al-Kidd*, 563 U.S. at 741–42.

Because the situation here rapidly developed, the Troopers did not have the luxury of fully assessing the immediacy of the threat that Shawn Knight posed to them or others—including Amanda Knight who was on the front porch as Shawn Knight rapidly began to emerge from his home with a gun in each hand. The Court cannot conclude as a matter of law that based on the record Shawn Knight did "not pose an immediate threat" to anyone on the scene and at minimum, cannot conclude that it would have been clear to Troopers Janosko and Bobanic based on then-existing caselaw that Shawn Knight did not pose a threat to their safety or the safety of others as he "flew" to his front door toward the officers armed with two handguns such that their actions were objectively unreasonable.

In *Phuong Duong v. Telford Borough*, 186 F. App'x 214 (3d Cir. 2006), the Third Circuit held that a jury could conclude that a constitutional violation occurred when an officer shot a man armed with a knife in the man's home and it was disputed whether the man was sitting and had "surrendered" when he was shot. *Id.* at 215. The Third Circuit denied the application of qualified immunity because it was clearly established that a police officer cannot shoot a suspect who poses no threat of physical harm, *id.* at 219, which would have been the case if the plaintiff's version of the facts in *Telford* were taken as true. But here, while there is a dispute as to exactly where Shawn Knight was holding his weapons, there is no dispute that he had a gun in each hand, was bolting from his home in the direction of the Troopers, and had raised one hand at least enough to push open a screen door. Plaintiff does not allege that Shawn Knight was attempting to surrender, and even under Plaintiff's own account of the incident, Shawn Knight went "flying to the front door," (Kim Knight Dep. at 90:17–22), with two guns in his hands. *Cf. Garner*, 471 U.S. at 11 ("A police officer may not seize an *unarmed, nondangerous* suspect by

-34-

shooting him dead.") (emphasis added). Such behavior, particularly Shawn Knight's rapid advancement toward the Troopers, is inconsistent with a "surrender."

Perhaps the case with the most closely analogous facts is *Brittingham v. City of Camden*, No. 07-190, 2009 WL 1410740 (D.N.J. May 18, 2009). The *Brittingham* court denied summary judgment on an excessive force claim against an officer who, according to the plaintiff, pursued the plaintiff after a street fight, burst through the plaintiff's front door, and shot the plaintiff immediately upon the officer's entry into the plaintiff's apartment without issuing a warning or verbal command. *Id.* at \*2. The *Brittingham* court concluded that it was clearly established that "a reasonable officer would, at minimum, have understood that he was required to issue a warning before using potentially deadly force upon a suspect." *Id.* at \*8 (citing *Ridgeway v. City of Woolwich Twp. Police Dep't*, 924 F. Supp. 653, 659 (D.N.J. 1996); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007); *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005); *Vathekan v. Prince George's Cty.*, 154 F.3d 173, 179–80 (4th Cir. 1998)).

For several reasons, the Court does not conclude that *Brittingham* clearly establishes the right at issue. As a district court decision, *Brittingham* is not binding on this Court, and in any event a single district court decision falls short of a "robust consensus of persuasive authority." *See al-Kidd*, 563 U.S. at 741. Furthermore, the Court concludes that the factual situation is distinguishable for qualified immunity purposes. Unlike in *Brittingham*, Shawn Knight *left* (or was in the process of leaving) his house and was rapidly *approaching* the Troopers, rather than the police officers entering the decedent's house in pursuit of him. Also, unlike the plaintiff in *Brittingham*, it is undisputed that Shawn Knight was armed with two guns, which when combined with his direction of rapid movement, would support a reasonable conclusion that Shawn Knight may have posed an immediate threat to the Troopers.

Finally, the Court does not agree that the cases cited by the *Brittingham* court in support of the "clearly established" rule represent a "robust consensus of persuasive authority" that place the constitutional question beyond debate. *See al-Kidd*, 563 U.S. at 741. *Brittingham* was decided in 2009. In the ten years since, as explained above, the Supreme Court has emphasized on numerous occasions that lower courts are required to take an exacting view of the facts in a particular case when determining whether a right is clearly established. All of the appellate decisions cited in *Brittingham* are factually distinguishable from this case. The *Vathekan* court concluded that it was clearly established "that it is objectively unreasonable for a police officer to fail to give a verbal warning before releasing a police dog to seize someone." 154 F.3d at 175, 179–80. Deploying a police dog in order to seize someone is a materially different tactic than firing a weapon at an armed man rapidly advancing toward two officers, and neither *Vathekan* nor the authority that it relied upon for "clearly establishing" the right at issue, *Kopf v. Wing*, 942 F.2d 265 (4th Cir. 1991), dealt with what were purportedly officer self-defense scenarios. Cases addressing the use of a police dog during a search of a home, *Vathekan*, 154 F.3d at 175, or in pursuit of a robbery suspect, *Kopf*, 942 F.2d at 266–67, would be of little guidance to an officer determining the appropriate course of action when confronted by an armed man suspected of domestic violence "flying" in their direction.

The *Craighead* court denied summary judgment to an officer that fired his shotgun without warning at a pair of individuals wrestling over a gun. 399 F.3d at 961–63. The Eighth Circuit held, under *Hope v. Pelzer*, 536 U.S. 730, 741 (2002),[23] that a factually analogous case

---

[23] In *Hope*, the Supreme Court held that "officials can still be on notice that their conduct violates established law even in novel factual circumstances" if the state of the law would give the officials a "fair warning" of the illegality of their actions. 536 U.S. at 741; *see also supra*, note 21. In the Court's estimation, however, the Supreme Court's virtually unending line of excessive force cases granting qualified immunity for defendant officers demonstrates that the *Hope* doctrine would not apply here, and would very rarely apply in excessive force cases, given that *Graham* emphasizes the consideration of "the facts and circumstances of each particular case" and counsels against second-guessing split-second decisions made by officers on the scene. 490 U.S. at 396–97; *see also Reese v. Cty. of*

was not necessary because every reasonable officer would understand that firing a shotgun, without warning, at two people wrestling over a gun such that neither had control over the gun thereby posing an immediate threat, was objectively unreasonable. *Id.* In other words, the Eighth Circuit relied on the objective unreasonableness of the *particular* facts of that case, so it has little persuasive effect in this case. The facts that the decedent here had exclusive control of his two guns and was affirmatively advancing from his home distinguishes *Craighead*.

Finally, in *Casey*, the Tenth Circuit held that it was clearly established that police officers cannot tackle, beat, and Taser a "citizen peacefully attempting to return to the courthouse with a file he should not have removed." 509 F.3d at 1278. *Casey* had nothing to do with the use of deadly force by the police, or the risk of it posed by the decedent. In the Court's estimation, *Casey* was a straightforward application of *Graham*, *i.e.*, the force employed by the police officers in the situation that they confronted was clearly excessive. As with *Craighead*, however, the facts at issue here are distinguishable from those in *Casey*. The decedent here was armed and "flying" toward the police officers through the front door with guns in each of his hands. This is far different from "peacefully attempting to return . . . a file." *Id.* A ruling on the reasonableness of the use of non-deadly force on a peaceful, suspected misdemeanant would not put the Troopers in this case on notice that their conduct in the circumstances presented here might violate Shawn Knight's constitutional rights.

---

*Sacramento*, 888 F.3d 1030, 1038–39 (9th Cir. 2018) (rejecting an argument for the denial of qualified premised on *Hope v. Pelzer* because the plaintiff's cited cases did not "demonstrate that the contours of his Fourth Amendment right were sufficiently clear such that "any reasonable official in [his] shoes would have understood that he was violating it."") (quoting *Sheehan*, 135 S. Ct. at 1774) (alterations in original). Because the Court is aware of no authority further refining the contours of the right to be free from excessive force—where the victim was armed and advancing toward the officers—the Court cannot conclude that the conduct presented by the particular facts here is akin to *Hope* such that "every reasonable official" in the Troopers' positions would have then understood that they were violating Shawn Knight's constitutional rights by shooting Shawn Knight dead as he rapidly approached into and from his doorway with two guns in his hands after being stirred from sleep on his couch.

Perhaps the most similar case from an appellate court was decided by the Ninth Circuit. That case—*Mattos v. Agarano*—also involved a domestic dispute. 661 F.3d 433 (9th Cir. 2011) (*en banc*). Police responded to a 9-1-1 call and found Troy Mattos sitting on his front porch. *Id.* at 438–39. After informing Mattos about the 9-1-1 call, the police asked if they could speak to Mattos's wife, Jayzel. *Id.* Troy went inside to get Jayzel, and an officer followed him inside. *Id.* Troy became angry and told the officer to leave the residence. *Id.* The other officer then entered the residence and told Troy he was being placed under arrest. *Id.* As he moved in to arrest Troy, the officer pushed up against Jayzel, who extended her arm to "stop [her] breasts from being smashed against [the officer's] body." *Id.* At the time, Jayzel was speaking to the other officer and attempting to defuse the situation. *Id.* Then, without warning, the officer who brushed up against Jayzel shot her with a Taser in dart-mode. *Id.*

The Ninth Circuit held that this constituted excessive force. *Mattos*, 661 F.3d at 449–52. Citing factors from *Graham*, the Ninth Circuit considered that Jayzel posed no threat to the officers, that *her* alleged "crime" (obstructing the officer from touching her body) was really no crime at all, that she was not resisting arrest nor impeding Troy's arrest, and that she was the alleged *victim* (rather than perpetrator) of domestic violence, in concluding that the officer's conduct was unreasonable under the totality of the circumstances. *Id.* The Ninth Circuit observed that "the fact that [the officer] gave no warning to Jayzel before tasing her pushes this use of force far beyond the pale" in light of that court's previous conclusions that "an officer's failure to warn, when it is plausible to do so, weighs in favor of finding a constitutional violation." *Id.* at 451 (internal citations omitted).

But once again, the failure to give a warning was just one factor in the totality of the circumstances that the Ninth Circuit considered. It was not dispositive, and this Court does not

read *Mattos* as establishing under what circumstances a warning is required prior to an officer exerting force, deadly or not. This is so because the Ninth Circuit concluded that the officer in *Mattos* was still entitled to qualified immunity even without having given a warning. 661 F.3d at 452. Despite authority from the Ninth Circuit and other courts of appeals explaining that a failure to warn tends to make an officer's use of force less reasonable, *id.* at 451, the *Mattos* court concluded that these general statements did not clearly establish that a warning was required in the situation that unfolded in *Mattos*. This conclusion supports the conclusion that the right at issue here was not clearly established.[24]

Moreover, *Mattos* is distinguishable from this case. Both cases involve reports of domestic violence, police arguably "forcing" their way into the victim's home to investigate, and the police exerting force in or around the home of the victim. But, in the Court's estimation, there is a material difference between the police confronting an armed man and alleged perpetrator of a crime (the case here) and their inflicting "intermediate" force upon an unarmed, non-threatening, purported victim of a crime (the case in *Mattos*). This difference is material enough so as to render any guidance from *Mattos* inapposite for qualified immunity purposes.

\* \* \*

This case is tragic. It began with a report of domestic violence allegedly caused by Shawn Knight, and ended when he was killed in the doorway of his home while seemingly under the mistaken belief that Trooper Bobanic was a dangerous unknown individual invading that home. Trooper Bobanic was not invited inside, and by the accounts of Kim and Amanda Knight,

---

[24] Courts in other circuits have explicitly acknowledged the importance of warnings prior to the infliction of force. *See also, e.g., Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (listing "whether the officers ordered the suspect to drop his weapon, and the suspect's compliance" as one of "a number of non-exhaustive factors" in assessing "the degree of threat facing officers"). However, no case (including *Garner*) "clearly establishes" when and under what circumstances a warning *must* be given in order for the infliction of deadly force to be considered constitutionally reasonable, or that qualified immunity is unavailable when a warning is not given.

the argument that precipitated Amanda Knight's 9-1-1 call had deescalated and the victim disclaimed the need for any further police involvement. Given that neither Trooper ever announced or identified themselves, a jury could conclude that Shawn Knight was legitimately confused after being awoken by Trooper Bobanic's entry into his home, and that Shawn Knight believed he was exercising his own rights to home protection when he grabbed his legally owned firearms to protect his home and family from a would-be home invader.[25] Before he could realize that the person entering his home was actually an unannounced Pennsylvania State Trooper, Shawn Knight was fatally shot multiple times through his chest.

The record in this case has not provided a straightforward explanation as to why Trooper Bobanic forced his way into the Knights' home, why neither he nor Trooper Janosko ever identified themselves as police officers, and why no warning or verbal command was given to Shawn Knight at any time before the Troopers discharged their service weapons and killed him. Doing any one of these things may well have spared Shawn Knight's life, and it appears to the Court that a jury could find that the Defendants played a substantial role in at least escalating the dangerousness of the situation that precipitated the fatal shooting.[26] But, by the same token,

---

[25] "[T]he inherent right of self-defense has been central to the Second Amendment right" and "the need for defense of self, family, and property is most acute" in the home. *District of Columbia v. Heller*, 554 U.S. 570, 628–36 (2008). This right was incorporated as to the several states shortly thereafter. *McDonald v. City of Chi.*, 561 U.S. 742 (2010); *see also Pauly II*, 874 F.3d at 1219.

[26] Seventy years ago, Justice Jackson envisioned with clarity the potentially tragic consequences of a police officer climbing unannounced through a window to enter a house where he believed unlawful conduct was afoot:

> When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant.

> I am less reluctant to reach this conclusion because the method of enforcing the law exemplified by this search is one which not only violates legal rights of defendant but is certain to involve the police in grave troubles if continued. That it did not do so on this occasion was due to luck more than to foresight. Many homeowners in this crime-beset city doubtless are armed. When a woman sees a strange man, in plain clothes, prying up her bedroom window and climbing in, her natural impulse would be to shoot. A plea of justifiable homicide might

-40-

the trial courts have been repeatedly warned by our appellate brethren that the law does not indulge the luxury of a court engaging in "Monday morning quarterbacking" of the actions of police officers, *Lamont*, 637 F.3d at 183, such as in this case where the officers had responded to a nighttime call for assistance in a domestic violence situation and were confronted by the alleged perpetrator coming at them quickly from the interior of his home with a gun in each hand, with one hand moving upward to at least some degree. *See also Sauers*, 905 F.3d at 719–20.

Plaintiff nonetheless argues that Defendants' role in escalating the situation renders their later use of force unreasonable. The Supreme Court recently expressly rejected such a basis for liability or, importantly here, the avoidance of qualified immunity. *See Cty. of L.A. v. Mendez*, 137 S. Ct. 1539, 1544 (2017) (abrogating *Billington v. Smith*, 292 F.3d 1177 (9th Cir. 2002)). This has also been the law in this Circuit for a long time. *See Hector v. Watt*, 235 F.3d 154, 160 (3d Cir. 2000) (citing *Bodine v. Warwick*, 72 F.3d 393, 400 (3d Cir. 1995) (Alito, J.)).[27] For these purposes, under settled Supreme Court and Third Circuit law,[28] it is of no moment that

---

> result awkwardly for enforcement officers. But an officer seeing a gun being drawn on him might shoot first. Under the circumstances of that case, I should not want the task of convincing a jury that it was not murder. I have no reluctance in condemning as unconstitutional a method of law enforcement so reckless and so fraught with danger and discredit to the law enforcement agencies themselves.

*McDonald v. United States*, 335 U.S. 451, 460–61 (1948) (Jackson, J., concurring).

[27] In *Bodine*, then-Judge Alito drew a distinction between "philosophic" or "but for" causation and "proximate" or "legal" causation, 72 F.3d at 400, and emphasized that the "causation of harm" determination as to harms allegedly due to an unlawful entry and those due to the unlawful use of force "must be kept separate," and must be analyzed distinctly, since "[t]he harm proximately caused by these two torts may overlap, but the two claims should not be conflated." *Id.* at 400–01. In this case, the Plaintiff brought no claim related to the lawfulness of Trooper Bobanic's entry into the home, and in any event, while the causation analysis would plainly inform the issue of liability on the merits, for the reasons noted at length, it does not impact the implications of the "clearly announced" prong of qualified immunity applicable here.

[28] But in a non-precedential 2015 case, the fact that the involved officers identified themselves made a big difference to the Fourth Circuit. Applying now-Justice Alito's *Bodine* analysis and hypothetical, the Fourth Circuit concluded that the estate of an individual who swung a knife at police officers who had entered his home without the requisite

-41-

Trooper Bobanic's unannounced entry into the Knights' home may have caused Shawn Knight to quickly arm himself and head to the front porch to investigate, placing himself and the Troopers in harm's way. In the context of qualified immunity, the Supreme Court tells us those actions of the Troopers matter not.

Because of the factual disputes identified as to the "objective reasonableness" of the Troopers' actions, the Court reaches no conclusion as to the resolution of the difficult question of whether a constitutional violation occurred in this case. There are more than sufficient factual disputes regarding the circumstances of Shawn Knight's death so as to support a finding (or not) of objectively unreasonable police conduct. In the ordinary course, this case would proceed to trial and a jury would be tasked with weighing the relevant evidence, assessing the credibility of the witnesses, and sorting out these factual disputes, in determining, as the finder of fact, what happened on the night of June 28, 2013. Only then could it be determined whether the Troopers acted objectively reasonably given the totality of the circumstances. But no jury will do so here, since the Supreme Court has crisply explained that the entire purpose of qualified immunity is to stop a case such as this in its tracks prior to its going to a jury. *See, e.g., Pearson*, 555 U.S. at 231–32; *Curley*, 298 F.3d at 277.

Summary judgment will be granted to the Defendants because neither the Plaintiff nor the Court has identified controlling legal authority, nor a robust consensus of persuasive legal authority, that clearly established, as of June 28, 2013, that all reasonable police officers would have known that the conduct exhibited by the Defendants in this case—shooting an armed man suspected of domestic violence, without warning or identification as police officers, in the

---

"knock and announce" was entitled to only nominal damages based on that "knock and announce" violation, and not damages tied to his subsequent death from being shot by those officers. Because he "must have known that the men in his apartment were police officers," the decedent's coming at them with a knife was a superseding cause of the decedent's death. *Kane v. Lewis*, 604 F. App'x 229, 237 (4th Cir. 2015). Here, there is no evidence advanced that Shawn Knight "must have known" that the Troopers were in fact police officers.

doorway of the man's home as the man rapidly approached the unidentified Troopers from inside of his home after being awoken by the Troopers' unannounced entry—was an unconstitutional seizure. This Court has honed in on the specific facts presented by this case, as recounted in detail above, in reaching this conclusion as it relates to these facts and this case. Undoubtedly, the Court has defined the right at issue here at an exacting level of granularity and precision, as the Court believes it is required to do under the law. The Supreme Court has made it crystal clear that very closely analogous facts are particularly important in the context presented here—an excessive force claim under the Fourth Amendment—and the Court is aware of no case that presents such facts so analogous so as to overcome the substantial hurdle of qualified immunity in this case.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 67) will be GRANTED. Summary judgment will be granted in favor of the Defendants and against the Plaintiff.

An appropriate Order will issue.

Mark R. Hornak
Chief United States District Judge

Dated:   May 17, 2019

cc:       All counsel of record